UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RONNIE DIGGS,

                        Petitioner,           **No. 07-CV-6240(VEB)**
                                                           **DECISION AND ORDER**
     -vs-

JOHN W. BURGE, Superintendent Elmira
Correctional Facility,

                        Respondent.
_____

**I.**        **Introduction**

*Pro se* petitioner Ronnie Diggs ("Diggs" or "Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Diggs is serving concurrent determinate sentences of twenty-five years on convictions of robbery in the first degree (four counts); fifteen years for convictions on robbery in the second degree (three counts); seven years for a conviction of assault in the second degree (one count); and fifteen years for a conviction of criminal possession of a weapon in the second degree (one count). The aggregate sentence is twenty-five years and there is a five-year term of post-release supervision. Diggs' habeas petition raises one ground for relief–that the prosecutor committed misconduct during summation. The Appellate Division rejected this contention on the merits on direct appeal. Respondent concedes that Petitioner has fully exhausted his state court remedies with regard to the prosecutorial misconduct claim and argues that the Appellate Division's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent and therefore habeas relief is not warranted.

The parties have consented to final disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

## II.     Factual Background

### A.     Summary of the Testimony at Trial

On July 23, 2002, Antonio Diaz, Jr. ("Diaz") and Jeremy Velasquez ("Velasquez") were riding their motorized scooters to a friend's house after school. On the way, two men approached the boys and inquired as to whether the scooters worked. Velasquez described the men as African-American and said that one was chubby; the other one was skinny. The skinny male, who was wearing a "do rag" on his head, asked whether the scooters worked. (187). The boys said they did and continued on to their destination.

About half an hour later, the boys left their friend's house on their scooters. As they neared the corner of Wilkins and Carter Streets, the two men "jumped out". (189). This time, Velasquez stated, the skinny man with the do rag had a gun. (192).

The gunman pointed the gun at Diaz's head and demanded the medallion Diaz was wearing. When Diaz did not give Petitioner the medallion, Petitioner ripped it off after yanking at it twice. (192). Petitioner then demand that Diaz empty his pockets, but Diaz refused, trying to swat the gun away from his head. (193). Petitioner cocked the trigger and again demanded that Diaz empty his pockets. Diaz then handed over twenty dollars. Petitioner pointed the gun at Diaz's left knee and fired, seriously injuring him. He then fled with Diaz's scooter. Petitioner was later found to be in possession of Diaz's medallion.

While Petitioner was robbing Diaz, his chubby accomplice was accosting Velasquez. (189). When Velasquez refused to give up his scooter, the accomplice wrested it away from him

and ran off. Velasquez turned around and saw Diaz being shot by the skinny man with the do rag. (Velasquez was unable to identify Petitioner as the assailant.) Velasquez ran over to Diaz, who limped for a moment then fell to the ground. The police soon arrived and an ambulance brought Diaz to Rochester General Hospital for treatment.

Later that same day, Antonio Diaz, Sr. ("Diaz, Sr.") was driving Velasquez home after they had visited Diaz in the hospital. (200). On Hudson Avenue, they saw two men riding scooters, one of which Velasquez stated that he could clearly tell was his own. (201). However, neither Velasquez nor Diaz, Sr. could identify the rider of the other scooter with certainty because he passed by them too quickly. (201-05; 340-41). Diaz, Sr. then stopped the car, got out, and began yelling at the man on Velasquez's scooter, who dropped the scooter and fled. (340). Diaz, Sr. placed the scooter in the trunk of his car before unsuccessfully trying to chase the man down. (340).

The following day, between 4:15 and 4:30 p.m., Diaz's girlfriend, Virmaris Castillo ("Gorda"), went with her niece to a convenience store on the corner of Hudson and Weeger Streets. (309-10). At the store, Gorda saw Petitioner standing with a group of people. According to Gorda, he was wearing what appeared to be Diaz's medallion. (312-14). Gorda overheard Petitioner saying that he had to "yank it two times to take it" and that "when he shot he didn't know where he shot at, all he seen [sic] was the kid drop and he grabbed his scooter and ran." (314). Gorda stated that the person with the medallion asked her niece what her name was and commented that she was beautiful and would grow up "to look just like [Gorda]." In court, Gorda identified People's Exhibit 3 as the medallion she observed on the person outside the store. (318-19).

Gorda then returned home and called the hospital, speaking briefly to Diaz before relating what she had seen and heard to Diaz, Sr.. (320; 326-27).

Gorda testified that she had seen the person boasting about the medallion at the grocery store on many occasions around the neighborhood. (334). She testified that she had picked him out of a photo array; however, in subsequent testimony, Gorda equivocated and said she was not sure if the person she had selected in the photo array was the same person. (330, 334).

Upon learning this information from Gorda, Diaz, Sr. went to the corner of Mark Street and Hudson Avenue, where he saw a man who matched the description Gorda had given. This man was on a porch on Mark Street and was wearing Diaz's medallion. (342). Diaz, Sr. then called 911 and gave Petitioner's description to the dispatcher. (345). Diaz, Sr. identified People's Exhibit 3 as a medallion he had bought for his son twelve or thirteen years ago. (343-44).

At approximately 5:00 p.m., Officers James Reed and Andrew MacKenzie, who were on bicycle patrol, received a call directing them to the corner of Mark Street and Hudson Avenue for the purpose of apprehending a suspect in the previous day's shooting. (400). As the two officers approached the corner, the people congregated there dispersed. The officers were unable to locate the suspect. (401).

Investigator Kevin Wehbring later went to Gorda's home, where she gave him a description of the man she had seen at the corner store. (322). At about 5:30, Investigator Wehbring broadcasted another request for officers to respond to the corner of Mark and Hudson to find the same suspect. (379-80; 401). When Officers Reed and MacKenzie returned to the corner and spotted Petitioner, who matched the description broadcasted, they arrested him. (402). They were soon joined by Officer Favian Rivera who recovered the medallion which Petitioner

had been wearing but which had fallen off during Petitioner's struggle with the officers. (383-85).

At about 6:30 p.m., Investigator Paul Friday showed the recovered medallion to Diaz, who identified it as the medallion stolen from his neck the day before. (416-17). Diaz subsequently identified Petitioner as his assailant during a line-up identification procedure on September 16, 2002, and also made an in-court identification. (271-75; 370).

Investigator Wehbring testified Gorda had stated that she could not make an identification and that she did not intend on assisting the police any further beyond giving the information she had already given. (373). Gorda denied telling Investigator Wehbring that she would not cooperate with the police beyond giving her rendition of the grocery store encounter and a description of the person to the police. (329-30).

The defense called Tina Latson ("Latson"), who testified that she was Diggs's girlfriend and had purchased the medallion that Diggs was wearing when apprehended at Tropical Music and Jewelry Store, pawnshop on North Clinton Avenue, as a gift for him. (T.456). According to Latson, Diggs was present when it was purchased. (458). Latson stated that she found the receipt in a shoebox and she identified Defendant's Exhibit D as the receipt for the medallion. (468, 458). There were two different handwritings on the paper; part of the receipt was filled out by the clerk and part was filled out by Diggs. (470-72).

The prosecution called several witnesses in rebuttal. Diaz testified that he never sold the medallion. (489). Delso Ferreira ("Ferreira"), the clerk at Tropical Music and Jewelry Store on North Clinton Avenue, testified that he recognized no handwriting on Defendant's Exhibit D, the receipt for the medallion produced by Diggs's girlfriend. (499). Ferreira looked at People's

Exhibit 3 and stated that it appeared to contain an image of a statue of St. Michael. Ferreira stated that although the store did sell similar St. Michael's medallions, the store had never sold that particular one. (502; 508-09).

James Beikirch of the Monroe County Sheriff's Office was called as a handwriting analysis expert. (519-20). He stated that the signature on Defendant's Exhibit D did not match up with known samples of Diggs's writing (524-25).

The defense recalled Latson, in surrebuttal to the handwriting expert. Latson testified that Diggs is right-handed. (557).

### B. Summations

During his closing argument, defense counsel stated that Antonio's girlfriend, Gorda, lied about her inability to identify petitioner in court because she did not want to cooperate any further in this prosecution. Defense counsel stated that in "the months preceding, the weeks preceding, she is cajoled by her boyfriend [Diaz], by her boyfriend's father [Diaz, Sr.], to continue in the prosecution of this case." (582). Although claiming not to be alleging a conspiracy against Petitioner, defense counsel continued to argue that the victim (Diaz), his father (Diaz, Sr.), and Gorda made up facts to support the identification of Petitioner as the assailant because he was found in possession of the medallion. (582-585).

In summation, the prosecutor responded to defense counsel's vendetta theory, arguing that if this was truly a vendetta the witness's stories would have been the same and they all would have identified him. The prosecutor argued,

> I submit to you that if this really was a vendetta, if they really wanted to settle the score ... [w]ouldn't they all point the finger at him. . . . and what about Virmaris ["Gorda"]? She never identified the defendant. She never said that he was the

person that she had seen on other occasions at the corner store, that he was, in fact, the one. She never identified he defendant. . . . She told the police that she thought she might be able to. She was shown some pictures and she wasn't able to. And she told you that they all looked very similar, so she gave the information that she had and that was it. . . . And [defense counsel] paints a picture that she used the words that she would not cooperate any further than giving information. That's police talk, ladies and gentlemen. That's Investigator Wehbring's characterization . . . .

(591-92). Defense counsel did not immediately object to this argument.

However, after summations, but before the jury was charged, defense counsel protested the prosecutor's argument, quoted above, that Gorda should be believed because of her failure to identify Diggs prior to trial or at trial. (611-16). Pointing out that the "District Attorney has a duty of good faith and fair dealing," trial counsel referred the court to the prosecutor's pre-trial "*Molineux* application" wherein the prosecutor stated that Gorda's prior observations of Diggs in her neighborhood dealing drugs were probative of identity. Trial counsel argued that, assuming the prosecutor's *Molineux* application was made in good faith, then the prosecutor in bad faith argued something she did not believe to be true when, during summation, she urged the jury to conclude that Gorda's non-identification of Diggs prior to trial was actually an indication of Gorda's credibility. As relief, defense counsel requested a curative jury instruction indicating that the prosecutor had a duty to correct Gorda's false testimony (614) and further requested that the trial court strike Gorda's testimony in its entirety (616). Defense counsel also requested that the prosecutor turn over any notes from her conversation with Gorda. (614). The trial court overruled the defense objected and denied the requested relief. (614).

C.     **Jury Deliberations and the Verdict**

During deliberations, the jury specifically requested and received a readback of Gorda's testimony about what she claimed to have overheard Diggs say outside the convenience store (i.e., when he was boasting about a medallion he was wearing, explaining that he had to yank it two times off the kid's neck, and that he shot the kid and grabbed his scooter). (651-53). The jury returned a verdict finding Diggs guilty as charged in the indictment. (666-69).

### D.     The Direct Appeal

On direct appeal, Diggs' appellate counsel argued that the prosecutor's failure to correct Gorda's false testimony violated Diggs' due process rights, and that even though the false testimony went to the witness's credibility only, reversal is nonetheless required. *See* Petitioner's Appellate Brief (citing *Napue v. Illinois,* 360 U.S. 264 (1959); *Berger v. United States,* 295 U.S. 78, 88 (1935) (Consonant with the special higher ethical standard imposed upon a public prosecutor, a prosecutor is not at liberty to employ "foul blows" for the sake of obtaining a conviction.); *People v. Pelchat,* 62 N.Y. 2d 97, 105 (1984) (A public prosecutor has special ethical duties, over and beyond the ethical duties required of other lawyers, in advocating his or her cause. Code of Professional Responsibility EC 7-13. "In his position as a public officer [the prosecutor) owes a duty of fair dealing to the accused and candor to the courts . . . .").

The People, in opposition to Petitioner's appellate brief, argued that the prosecutor in this case did not breach her ethical duties and that Petitioner was denied his right to a fair trial as a result of the challenged comments. The People argued that the prosecutor's closing statement to the jury was based on the evidence presented at the trial and was made in direct response to the closing arguments made by defense counsel.

The Appellate Division disagreed with Petitioner that the prosecutor's argument required

reversal:

> We reject defendant's sole contention on appeal that reversal is required based on prosecutorial misconduct on summation. The record does not support defendant's contention that the prosecution advanced a theory premised on a fact known by the prosecutor to be false in order to discredit defendant (*cf. People v. Cotton*, 242 A.D.2d 638, 662 N.Y.S.2d 135). Rather, the challenged remarks were "fair comment" on the evidence (*People v. Hilliard*, 279 A.D.2d 590, 590, 719 N.Y.S.2d 600, lv. denied 96 N.Y.2d 784, 725 N.Y.S.2d 648, 749 N.E.2d 217) and, indeed, were "made in response to . . . defense counsel's arguments on summation" (*People v. Thomas*, 8 A.D.3d 506, 507, 778 N.Y.S.2d 523, lv. denied 3 N.Y.3d 682, 784 N.Y.S.2d 20, 817 N.E.2d 838).

*People v. Diggs*, 24 A.D.3d 1261, 1262, 805 N.Y.S.2d 886, 887, 2005 N.Y. Slip Op. 09907 (App. Div. 4th Dept. 2005).

### D. The *Coram Nobis* Application

Diggs filed a *pro se* application for a writ of error *coram nobis* with the Appellate Division arguing that appellate counsel had failed to render constitutionally effective assistance on appeal. The Appellate Division summarily denied relief and the New York Court of Appeals denied leave to appeal.

### E. The Federal Habeas Petition

This timely habeas petition followed in which Diggs raises the same prosecutorial misconduct claim he asserted on direct appeal. This claim is fully exhausted for purposes of habeas review, and Respondent does not claim otherwise.

For the reasons that follow, the petition is dismissed.

## III. Standard of Review Under the Amended Version of 28 U.S.C. § 2254

When a petitioner "in custody pursuant to the judgment of a State court" seeks habeas review of "any claim that was adjudicated on the merits in State court," a habeas writ may issue

only if the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law as determined by the Supreme Court if either (a) "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law," or (b) "the state court considers facts that are materially indistinguishable from a relevant Supreme Court case and arrives at an opposite result." *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). An "unreasonable application" of clearly established federal law occurs if (a) " 'the state court identifies the correct governing legal rules from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case,' " or (b) the "state court invokes a Supreme Court case and unreasonably extends its legal principle to a new context where it should not apply, or fails to extend it where it should apply." *Williams*, 529 U.S. at 407.

In addition, "a determination of a factual issue made by a State court shall be presumed to be correct," and the applicant for habeas relief has the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### IV.   Discussion

Because the Appellate Division adjudicated Diggs's prosecutorial misconduct claim on the merits, this Court must ask whether that ruling amounted to an unreasonable application of the Supreme Court's clearly established precedent on the issue of prosecutorial misconduct. *See, e.g., Williams v. Taylor*, 529 U.S. at 404-406; 28 U.S.C. § 2254(d)(1); *Sellan v. Kuhlman*, 261

F.3d 303, 312 (2d Cir.2001) ("For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim-even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.").

Collateral challenges to prosecutorial misconduct must be reviewed under the narrow standard of review for due process claims, not the "broad exercise of supervisory power." *Darden v. Wainwright*, 477 US 168, 181 (1986) (citing *Donnelly v. DeChristoforo*, 416 US 637, 642 [1974]). As the Supreme Court articulated in *Darden,* when considering claims of prosecutorial misconduct on habeas review, the issue is not whether the prosecutor's statements to the jury were "'undesirable or even universally condemned' . . . . The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" 477 US at 181 (quoting *Donnelly,* 416 US at 642). "Under the standard of *Donnelly*, the question before a federal appellate court is whether 'the prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally unfair." *Floyd v. Meachum*, 907 F2d 347, 353 (2d Cir. 1990) (internal quotations and citations omitted). In analyzing the prosecutor's statements made during summation to determine whether the defendant suffered substantial prejudice, this Court must view the statements in the context of the prosecutor's entire argument to the jury. United States v. Casamento, 887 F.2d 1141, 1189 (2nd Cir.1989) cert. denied, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990)

The Supreme Court "has consistently held that a conviction obtained by the knowing use

of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). "The same prosecutorial duty applies where the witness's testimony is simply false rather than perjurious." *Thomas v. Kuhlman*, 255 F.Supp.2d 99, 108 (E.D.N.Y. 2003) (citing *United States v. Boyd,* 55 F.3d 239, 243 (7th Cir.1995) ("The wrong of knowing use by prosecutors of perjured testimony is different, and misnamed–it is knowing use of false testimony. It is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew, false."); *United States v. Iverson,* 637 F.2d 799, 805 n. 19 (D.C. Cir.1980); 5 Wayne R. LeFave, et al., *Criminal Procedure* 497 (1999) ("As lower courts have noted, it matters not whether the witness giving false testimony was mistaken or intentionally lying. If the prosecution knows that the witness's statement is untrue, it has a duty to correct it."); *see also see also Napue*, 360 U.S. at 269.

"Misconduct may also occur where a prosecutor knowingly presents ambiguous evidence to the jury in a misleading manner." *Thomas*, 255 F. Supp.2d at 108 (citing *Hamric v. Bailey,* 386 F.2d 390, 394 (4th Cir.1967) (prosecutorial misconduct occurs "not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact"). To successfully challenge a conviction based on the grounds of prosecutorial misconduct, a defendant therefore is required to show that "(1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *United States v. Helmsley,* 985 F.2d 1202, 1205-06 (2d Cir.1993) (quoting *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392).

Based upon the record in this case, the Appellate Division did not unreasonably apply clearly established Federal law in concluding that the prosecutor did not advance a theory premised on a fact known by the prosecutor to be false in order to discredit defendant and that the challenged remarks were "fair comment" on the evidence made in response to defense counsel's arguments on summation.

First, it was not unreasonable for the Appellate Division to conclude that the complained-of statements did not amount to the prosecutor making an argument based upon knowingly false evidence, but rather, were made in direct response to defense counsel's claim during his closing argument that the People's witnesses had a vendetta against Petitioner and that they had fabricated their testimony. The trial evidence established that Gorda could not make an in-court identification of Petitioner. It is rather disingenuous for Petitioner to argue that the prosecution should have brought to the trial court's attention, during the trial, that Gorda *thought* she could identify Petitioner because she had seen him dealing drugs in her neighborhood and had told the prosecutor that she really *could* identify him because she had seen him selling drugs before–so the jury then could have been instructed that this witness was not truthful in her non-identification of Petitioner. Indeed, trial counsel strenuously objected to the prosecutor's *Molineux* application to introduce evidence of uncharged crimes–that is, proposed testimony from Gorda that she had seen Petitioner selling drugs in the neighborhood.

"[I]f the prosecutor's remarks were 'invited, and did more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." *Young*, 470 U.S. at 12-13. Here, the defense attacked the credibility of the People's witnesses, the prosecutor was "entitled to reply with rebutting language suitable to the occasion." *United States v. Rivera*,

22 F3d 430, 438 (2d Cir. 1994) (internal quotations and citations omitted). The prosecutor referred the jury to the evidence which contradicted defense counsel's argument–namely, Gorda's inability to identify Petitioner during a pre-trial identification procedure or at trial.

Second, with regard to the conclusion that the argument was "fair comment" and an "invited response," the Appellate Division did not unreasonably apply Federal law. The prosecutor's comments must be assessed in light of the defense summation. *See United States v. Young*, 470 U.S. 1, 11-12 (1985) ("[T]he remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant.") (citations omitted); *see also Darden v. Wainwright,* 477 U.S. at 181 (several improper comments in prosecution summation held not to deprive defendant of fair trial because invited by defense summation); *United States v. Tutino,* 883 F.2d 1125, 1131 (2d Cir.1989) (impermissible references in prosecution summation to information not in evidence held not to deprive defendant of a fair trial, in part because the remarks were made in response to defense contentions), cert. denied, 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990). The Appellate Division did not unreasonably conclude that the prosecutor's summation in this case was fair comment on the evidence at trial in light of defense counsel's summation argument that Gorda was coaxed into accusing Petitioner by her boyfriend and the boyfriend's father.

V.     **Conclusion**

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254 is denied, and the petition is dismissed. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

/s/  *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:   March 22, 2011
             Rochester, New York